19-2304 South Dakota United States v. Marlon Iron Crow Miss Patterson, can you hear me? I can, yes. Very good. Miss Poppin, can you turn your camera on? Yes, I can hear you. Very good. Thank you so much. Your Honor, counsel are ready. All right. Thank you. Miss Patterson, we're ready to hear from you. Thank you. Thank you, Your Honors, for the opportunity to present oral argument today on behalf of my client Marlon Iron Crow. We sincerely appreciate this opportunity. Your Honor, we are asking for a reversal of the conviction of second degree murder in this case. The reason for that are many as outlined in appellant's brief. I will begin with one of central arguments that we have, and that, Your Honors, is that the district court erred in denying the argument of the sufficiency of the evidence argument, both under a motion for judgment of acquittal and under a motion for new trial. Your Honors, even under the more stringent motion for judgment of acquittal standard, we submit that the evidence failed to prove that this was second degree murder. We can start with the government's opening statement. In that, the government said that Mr. Targing Crow could have been dead when it was alleged that my client, Marlon, actually ended up kicking or stomping on Mr. Targing Crow. There has to be proof beyond a reasonable doubt that an act requiring malice was the cause of Mr. Targing Crow's death, and it just didn't happen in this case. The government's own witness, Dr. Hobby, testified that what was the cause of death was a lacerated basilar artery. Dr. Hobby, the government's expert, testified that what caused that laceration is blunt trauma. Dr. Hobby testified that blunt force trauma is general and can be any number of things. It can be from a fist. It can be from falling. It can be from hitting the head when falling. The government's own witnesses, LT, Nicole, and my client's recorded interrogation all presented evidence that there was a fist fight and that Mr. Targing Crow fell and was knocked out. Dr. Hobby says that a lacerated basilar artery, essentially, it kills you instantaneously or very shortly thereafter. Well, so your position is that you believe that the evidence showed that the death likely took place immediately upon either impact on the floor or by the fist. Is that correct? Correct. Let's just take that as the premise for this question. If there is also evidence of a stomping that I believe was presented at trial, would that be relevant to his intent and to the idea of malice even if it was not the cause of the death? Yes, your honor. It would absolutely... Well, your honor, that's a good question. It is absolutely relevant to proving malice. It's our position that that piece of alleged evidence, which we dispute, but would be the only evidence which would show malice of forethought because a mere fist fight is not second-degree murder. An accidental killing is not second-degree murder. Stomping on someone's face, arguably, is second-degree murder. The point is, even if Marlon stomped on his face, which we vehemently dispute, but even if that occurred, the government cannot prove that that was the cause of his death. It is that act which needs to be the cause of death to sustain, beyond a reasonable doubt, second-degree murder. Well, actually, you could relate that to malice of forethought, right? Even under your analysis, I'm missing the whole point. Could be. I'm not very smart. Obviously, that's not correct. You are very smart, but no, your honor. No, I guess I disagree, your honor, because, for instance, the judge in his sentencing stated that one of the reasons he was not allowing a variance was because he said that my client thought about this, that he purposely had time after the punching or whatever, he put on his boots, he walked over and he stomped on his face. Your honor, that would be a distinct act from punching, which we submit was done in and in a hypothetical, let's say someone's dead and another person comes up and shoots them in the head, they have not committed a murder. Why? Because they didn't cause the death. The person was already dead. The point is, the government's own witness made it that you either die instantaneously or very shortly thereafter. Their witnesses said that Mr. Chargent Crow was knocked out when he fell. From LT's testimony, he fell from the table. My client said when he was acting in self-defense in a fistfight, they stumbled and fell, and he thought Mr. Chargent Crow was knocked out. In Nicole Morset's testimony, she said that she saw Mr. Chargent Crow fall and hit his head either on a window sill or his head hit the wall and turned. The point is, all of those acts, your honor, could have been the cause of the death. There's nothing that can prove beyond a reasonable doubt that that isn't what killed them. If it is, then there's no proof beyond a reasonable doubt of malice of poor thought. Therefore, the district court erred in denying the motion for judgment of acquittal and motion for new trial based on sufficiency of the evidence argument. Moving along, another argument that's very important to my client is that not only is that a point, but there are several other ways that Mr. Chargent Crow could have died, and I've outlined that in the brief. I do want to spend a little time on the prejudice that my client maintains occurred in this case. I don't think that that can be taken away from the argument of sufficiency of the evidence and how a jury could have come to an unreasonable result. That is because in this case, we had a persistent pattern of what is our opinion was evidence contrary to court order. It wasn't just an isolated incident, but it occurred we submit from the beginning of the case to the very end. That pattern of the jury seeing the government continually defy court order or defy court order prejudiced this case and inflamed the jury against my client and prevented them from being able to rationally take in a defense's theory of the case. Essentially, and I don't know, I don't know what are in the minds of an individual jury in this case, we'll never know, but it's, from my perspective, reasonable that it inflamed the jury to that the government knew something because it's the government after all. Even though the law says that the defendant is presumed innocent, it's my humble position that when the United States government speaks, it matters. If the United States government is continually defying court order in front of the jury, that is prejudicial. The government defied court order by bolstering a key witness they had and kept saying, I told you to tell the truth. A version of the truth will set you free. Their version of the truth. Is that what you mean by the government's leading the jury to believe that they were withholding something because of the interaction between the prosecutor and the key witness? It could be interpreted that, Your Honor, but that more so, for instance, in the t-shirt incident where the government spent a long time trying to get a t-shirt in that the court kept ruling was not admissible. They even tried to bring it back in and serve rebuttal. That presents to the jury that we're trying to give you something that's the truth, but we're prevented from it. It just prejudiced the jury so that essentially they turned off and decided, you know what? The jury's trying to present us stuff. We can't hear it. They're telling us the truth. That's what they keep saying. The case was pretty much done. That would help explain why, in my opinion, we have an irrational jury result because from our perspective, second degree murder was not proved beyond reasonable doubt. That also goes to their requirement to prove self-defense. Did you request a lesser included? Yes. I requested a lesser included and actually received all of them, including a simple assault lesser included. Yes. Your Honor, I guess I asked for five minutes for rebuttal. If there are no further questions, I will stop now. I do have one question, which is on the improper vouching, which was the thing that you had just been talking about. I agree that it wasn't great. It's less than the prosecutor saying, for example, she's obviously telling the truth or he's obviously telling the truth. I told so-and-so to tell the truth. But combined with the nature of that alleged misconduct, the district court gave curative instructions. I'm wondering if we combine the nature of the misconduct, which is not great, but not as serious as what I described before. Why didn't the curative instructions do the job? Thank you for that question, Your Honor. Well, because A, I submit that in a case where there is violation of court order from the beginning to the end, which I submit occurred in this case, not just in improper vouching, but in, for instance, the t-shirt incident, that presents a cumulative error, which repeated curative instructions cannot cure. That is our position. But in an important improper bolstering, Your Honor, which is not true, I submit this is one of the worst of the improper vouching colloquy between the government and Nicole Morissette. For instance, the government said, what did I tell you about telling the truth? Ms. Morissette, the truth will set me free and I will feel more better. And it goes on and the government ends by saying, I told you that the truth will be the story that will show you didn't do anything wrong. Isn't that true? And I objected and the court, we'd had a bench conference, but the court overruled it. So there was no curative instruction. There was no sustaining the ejection. The jury just heard, okay, well, I guess that improper bolstering was okay. So then you have a confusion of curative instructions, how effective are they when there's inconsistent instructions coming from the court, if that would make any sense, Your Honor. So if I have no further questions, thank you. All right. You may reserve the rest. Thank you. May it please the court and Ms. Patterson. Good afternoon. My name is Megan Poppin. I'm an assistant United States attorney for the district of South Dakota. And my office is in the Western Division in Rapid City. On November 11, 2016, Marlon Iron Crow, the defendant, took the life of another human being, Craig Charging Crow. This was an unusual case in that the defendant's actions of assaulting the victim in the head and face resulted in severing his basilar artery and then therefore killing him. His assault was the direct reason as to why Craig Charging Crow died. Because the testimony and evidence was sufficient to sustain a verdict of guilty, this court should not reverse the conviction. Even if the alleged statements by the government were improper, the defendant cannot show that it has been prejudiced. And because the sentence was substantively reasonable, this court should affirm Judge Viking's sentence of 240 months. Currently before the court, there are four issues. The first issue is the district court did not err in denying defendant's facts and challenge. Second, there was no alleged improper government conduct. Third, the evidence in this case was sufficient to find the defendant guilty of second-degree murder. And then finally, the district court did not err in sentencing Iron Crow to 240 months. The evidence in this case was sufficient and this court is aware that it must uphold the verdict if there is an interpretation of evidence that supports that a could have found the defendant guilty of the crime. And that's what the jury did in this case. This court may only overturn if no reasonable jury could have found the defendant guilty of second-degree murder. And that's not the case. I want to start off with the argument that Ms. Patterson started with and that is that the evidence in this case isn't sufficient to sustain a guilty verdict. The trial, the jury, her testimony from eyewitnesses from a forensic pathologist and the uncontroverted, unimpeached testimony of a 12-year-old boy named LT. His statement through his very eyes witnessed the defendant, Marlon Iron Crow, be the aggressor, be the first one to exact violence upon Craig Charging Crow. It was then at that moment when Marlon Iron Crow struck Craig Charging Crow in the chin face area that Charging Crow was knocked onto the ground. At this point, this attack was unending. It was unrelented. The only moment that it stopped was when the defendant stopped momentarily so that he could get his construction work boots on and then stomp on this man's face. And that is what the court instructed on malice in this case, which is instruction number four before the jury in this case. And as the court pointed out, in determining whether Iron Crow unlawfully killed Craig Charging Crow with malice support, you should consider all the evidence concerning the facts and circumstances before, during, and after the offense, which tend to shed light on the question of intent. What about the medical evidence? Did the medical evidence support a stomping? Yes, the evidence supported that there was a stomping. I asked Dr. Hobby on direct examination if a kick and or a stomp could cause this artery to become severed and Dr. Hobby answered, absolutely. Well, what about the physical? I guess I'm envisioning and I understand that connection that that would be a possible cause of the specific injury that caused the death. But what about the physical, the face, the chin? I'm thinking that there would be testimony of some kind of a mark near where that happened. Was there testimony to support that? Yes, there was evidence in the record in the form of Dr. Hobby's testimony, Morset's testimony, LT's testimony. Photographs were admitted at trial that showed Craig Charging he had bruising to his face. This testimony combined with LT's testimony, Dr. Hobby's testimony, Morset's testimony supports. And as Dr. Hobby said, all it takes is one punch to the face that causes this artery to become stretched and tort and sever that artery. And I guess I don't mean to belabor this too much, but I'm just envisioning a stomping by a man to another man's face. I would think that there might be broken bones or there might be something more than just a slight, or I don't know if it's slight, but an injury to the lip. And I just was curious how that testimony or evidence came out and whether that was debated at the trial. Yes. The defense put on testimony that absolutely if this man had been kicked and or stomped on that he would have had fractures. Well, in every assault resulting in serious bodily injury or with a dangerous weapon, you're not always absolutely going to have head fractures, eye fractures, facial fractures. In this case, what Dr. Hobby also testified to though was that as he reflected the scalp backwards underneath that layer of skin, the subcutaneous layer, he had four injuries that were hemorrhaginous. What's significant about this and what Dr. Hobby testified about was this indicates that Craig Charging Crow was alive at the time that he was kicked, stomped, punched in the head. Those injuries were bleeding. So he was actively alive. His heart was pumping, blood was going through his system. Otherwise, if he had, like he had the injuries from his chest, he had a bruise to his sternum. Dr. Hobby testified that those were slightly discolored, which to him is suggestive of his heart was not beating at the time that those injuries were done to his chest. And those were simply resuscitative methods that caused the injuries to his chest. There was also testimony by FBI Special Agent Bob Bennett, who photographed the T-shirt that Charging Crow was wearing the evening that he was stomped on. Special Agent Bob Bennett testified that in his opinion, that looked like a footprint or a shoe print consistent with a boot or a shoe. That evidence was admitted. And I don't believe there was any testimony to rebut that. Certainly, Marlon Island Crow felt that Craig Charging Crow was still alive. And that's why he continued to beat on this man, even though he was dead. So there was sufficient evidence in this case to sustain the trial's verdict of guilty. Now, we've touched on the curative instructions by this court. This court is aware that the curative instructions in this case, when they're there, that doesn't show a substantial amount of prejudice to the defendant. Now, just to kind of back up a little bit, I want to go into the issue regarding the conduct by the prosecutor, which was myself in this case. Now, Judge Baiken allowed the testimony of Morissette to come in. This wasn't a case in which Morissette was prevented from testifying. She testified to the actions that she saw, and these were rejected. She testified to what she observed. Every witness the defendant wanted to call was called to testify. And any improper statement by me was not alleged misconduct. There is a case it's the United States versus Plumlee, and it is a 2000 case where the court ruled that when a prosecutor instructs or tells the witness about its responsibility to tell the truth in a plea agreement, that this isn't improper and that this isn't misconduct. What we had in this case was that the district court allowed the testimony in about what effect, if any, me talking to Morissette in advance of trial had on her. But the district court did put a limit on it, isn't that right? I mean, to say that it was, as I read the district court's sidebar statements to counsel and then the curative instructions, my reading is that he did not think it was proper. Now, that's a different question as to whether the curative instruction is sufficient for purposes of error or reversible error. But I guess I read the district court as saying, now, this is just not proper. The district court did not like the fact that I was bringing in what I had told Morissette. And I agree, it was inartful, it was uneloquent, it wasn't the best way to pose it, but it doesn't rise to the level of misconduct, nor do I believe that rises to the level of vouching or trying to bolster this witness's credibility. As the record reflects, Ms. Morissette was allowed to testify to the first version of events, the second version of events that she gave through the defense investigator, and what was then brought up was whether or not I had threatened her or caused her to change her story. And as the district court properly held, there was no misconduct by myself as a prosecutor, and it did provide a curative instruction. Now, the appellant talks about or discusses that this error was introduced through the trial in all stages. But as this court has really taken a significant view on is the rebuttal and or closing statements before the jury. This wasn't a situation in which there was certain comments by the United States that left or were left unaddressed. The defendant was given each and every opportunity to put on evidence and or excuse me, rather, they were given every opportunity to cross-examine or present evidence if they felt necessary. This is a jury trial process. None of these alleged misconduct amounts to being such a offering such a prejudice against the defendant. You know, I would like to ask, you know, just in the context of the prejudice throughout the trial, I mean, this trial started off on a bad footing and never got any better. There were things going on that were just showed that the lawyers were not sort of on the same page and they weren't really getting it all done. And it starts off in voir dire and there's the judge decides to instruct the jury on the elements of the offense before voir dire starts. And right away in voir dire, there's a lot of talk about the facts of the case. There's a lot of fact questions about, well, what do you think the judge's doing? Is this common in South Dakota? I mean, it struck me as very odd and that there were misstatements that were being made, frankly, on both sides about what those instructions might mean. And then it kind of went downhill from there. I mean, it started off sloppy and it didn't really seem to be getting any better. And I'd just like your input on that. This was a very unusual case in which having a very competent, understanding, technical, engaged jury was very, very important. And when we use such a topic as malice, it's not a common topic that everyone uses. It's not common in South Dakota to do this unless we have an unusual case like we did, which I believe was important to get the most competent jury out there and available to hear the facts. But again, even if the comments were sloppy or the voir dire could have been better, it wasn't such that it affected the defendant's right to a fair trial in this case. And it wasn't like every decision went to the government's benefit. In this case, the defendant was allowed to introduce his own statement in this case without it being offered by the party opponent, which would have been myself. The defendant was instructed that self defense applies to involuntary manslaughter, which I believe this 8th Circuit Court, this court has found that it directly goes in opposition to that. The defense was allowed every opportunity they could to present the facts in a light that they wanted to. And if there was any alleged misconduct on my behalf, it wasn't so that it violated their rights to a fair trial. In fact, it was the defendant himself that wanted this questioning around Morset and her testimony to come in. And I don't think that the defendant should be allowed to then claim that he is prejudiced with this when he was the one that wanted this testimony in. Your honors, I see that I have approximately one and a half minutes left at this time. If there are no other questions, I would respectfully request that this court affirm the district court's decision to sentence Iron Crow to 240 months because it was reasonable. Finally, after days of testimony and evidence, including eyewitness testimony and a forensic pathologist, the jury found the defendant guilty of second degree murder. This jury was convinced that the defendant committed the acts that it I would ask you to affirm his conviction and sentence. Thank you. Thank you, counsel. Ms. Patterson, I think you have reserved some rebuttal. And I'll remind you to take your mute off. All right. Thank you. Your honor, I would like to go to the issue of injury. We submit that the evidence presented at trial of injury to Mr. Crow's face would not sustain a verdict of second degree murder because, as the court correctly, I believe, notes, a stomping, which the testimony of LTU was that Mr. Charging Crow was laying flat on the floor and that Mr. Iron Crow stomped on his face with a heavy work boot, that there would have been broken bones. And in fact, defense expert Brian Levinson testified to just that, and that is noted on appellant's brief, page 21, trial transcript 370. Your honor, the government brought up Agent Bennett's testimony regarding the T-shirt. That was an issue, your honor, because that T-shirt was sent off to the government's forensic lab, and we had to call their agent to put into the record, and that's referenced on appellant's brief, page 18, trial testimony, page 270, that Agent wrote and testified that the government analyzed the appellant's boot for comparison to the alleged shoe prints found on Mr. Charging Crow's shirt and determined, quote, there was not enough detail in the imprint on the shirt to compare to the boots, which would have allowed him to say those boots caused that imprint. So that would have been the testimony of an expert, but we would have had to have continued the trial to get that actual expert to put that in, so it came in through the FBI agent McGrodin that defense had to call. And the boot that was put into evidence, if you feel it, they're heavy, and if you stomp on someone's face, then the evidence was there was a small cut to the chin and lip, which Brian Levinson testified could very well have been caused by the intubation device. Thank you, counsel. Thank you to both attorneys in this case. We appreciate the argument, and we will take the matter under advisement. Thank you.